Tomacita NEGRON, by her next friend, Jonathan Weiss, Plaintiff-Appellant,

v.

John A. WALLACE, individually and as Director of Probation of the City of New York; Arthur B. Cole, individually and as Director of Institutional Services of Office of Probation of the City of New York; and Richard Johnson, individually and as Director of the Manida Juvenile Center, Defendants-Appellees.

Nos. 246, 247, Dockets 35037, 35166.

United States Court of Appeals, Second Circuit.

Argued Nov. 30, 1970.

Decided Jan. 4, 1971.

Jonathan Weiss, Center on Social Welfare Policy & Law, New York City (John Gray, Center on Social Welfare Policy & Law, New York City, of counsel, and Abraham A. Arditi, on the brief), for plaintiff-appellant.

Carmen J. Beauchamp, Asst. Counsel, New York City (Lawrence N. Marcus,

Counsel, Judicial Conference of the State of New York, New York City, of counsel), for defendants-appellees.

Before FRIENDLY, SMITH and ANDERSON, Circuit Judges.

FRIENDLY, Circuit Judge:

This court yields to none in recognizing the high place in our legal system held by § 1 of the Enforcement Act of 1871, 17 Stat. 13, now 42 U.S.C. § 1983, and the Act's jurisdictional implementation, 28 U.S.C. § 1343(3). It would be hard to think of any more compelling task for a federal court than "to redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States." If the time has come, as many federal judges are convinced it has, when in order to discharge that duty, to expedite the trial of federal criminal cases, and to determine other questions arising under federal law, the federal courts must be relieved of tasks for which they have no peculiar competence, the Congress should move swiftly to that end.

On the other hand, the framers of the Act of 1871 could hardly have intended it to become the standard method of constitutional attack upon state action although, until then, the lower federal courts had scarcely been available for that purpose at all, see Hart & Wechsler, The Federal Courts and the Federal System, 727–30 (1953). Suits under that statute thus should not be lightly brought. Apart from the burden they impose on federal judges[1] and their abrasive effect on federal-state relations, counsel should never forget Mr. Justice Jackson's observation, in a closely related context, that "it must prejudice the occasional meritorious application to be buried in a flood of worthless ones." Brown v. Allen, 344 U.S. 443, 537, 73 S.Ct. 397, 425, 97 L.Ed. 469 (1953) (concurring opinion). See Note, Limiting the Section 1983 Action in the Wake of Monroe v. Pape, 82 Harv.L.Rev. 1486 (1969), and the reply by Paul Chevigny, Esq., attorney for the New York Civil Liberties Union, 83 Harv.L. Rev. 1352 (1970). There is thus a responsibility, resting upon all counsel but especially upon those for civil rights organizations, not to swell the tidal wave of actions under the civil rights statute by bringing suits for declaratory or injunctive relief when no need for this exists. All too often we see a motion for a temporary injunction allegedly requiring the district judge to set all his other tasks aside and determine, in days or even hours, on the basis of conflicting affidavits, much of them hearsay, and scanty briefs, a constitutional issue of great pith and moment that could have been considered, in a much more orderly fashion and with a better development of the facts, by the presentation of a defense in a state court, with ultimate review by the Supreme Court if that should prove to be required. If the judge denies the temporary injunction, as he well may do simply because of the inadequacy of the factual showing, this court is similarly asked to shunt other suitors aside and stay or precipitately reverse. Another variant, even less excusable, is a case like this, where the need for action by *any* court on the point that ignited the controversy has disappeared even before the suit was brought and where problems for the future, if there are any, can in all probability be resolved by calm discussions with state officials in the absence of any litigation whatsoever. Compare Fortas, Thurman

---

[1]. Actions under the Civil Rights Act have grown from 296 in the fiscal year 1961 to 3985 in the fiscal year 1970, an increase of 1246%. In the past year alone there was a 62.5% increase, to 3985 in 1970 from 2453 in 1969. No other category of civil litigation except state prisoner petitions has shown anything like such explosive growth. See Ann.Rep. of Director of Adm. Office of the United States Courts, 1970, Table 12B.

Arnold and the Theatre of the Law, 79 Yale L.J. 988, 995 (1970).

The action concerns New York's procedures with respect to counsel under Article 7 of the Family Court Act, entitled "Proceedings Concerning Juvenile Delinquency and Whether a Person is in Need of Supervision," more particularly the latter. Section 732 provides for a proceeding to adjudicate a male under 16 or a female under 18 as being in need of supervision if the child "is an habitual truant or is incorrigible, ungovernable, or habitually disobedient and beyond the lawful control of his parents, guardian or lawful custodian" and "requires supervision or treatment." Proceedings may be initiated by a peace officer, the parent or other person legally responsible for the juvenile's care, a victim or witness of the juvenile's objectionable activity, or the recognized agents of a duly authorized organization, § 733. Detention pending the initial hearing is authorized only if the court finds there is a substantial probability that the juvenile will not appear in court on the return date or a serious risk that before that date he may do an act which would constitute a crime if performed by an adult. The next step is a "fact-finding hearing," § 742, which must be held within three days after the filing of the petition if the juvenile is under detention, § 747. This hearing is limited to determining whether the juvenile did the acts alleged to demonstrate that he needs supervision, § 742. At the conclusion of this hearing or later, there is a "dispositional hearing" to determine whether the juvenile requires supervision or treatment, §§ 743, 746.

Article 2, Part 4, of the Family Court Act manifests New York's concern "that minors who are the subject of family court proceedings should be represented by counsel of their own choosing or by law guardians," § 241. This latter group consists of attorneys "admitted to practice law in the state of New York" who are designated as law guardians by the appellate division of the Supreme Court through agreement with a legal aid society, or otherwise, §§ 242, 243. In any proceeding under Article 7, the family court must "appoint a law guardian to represent a minor who is the subject of the proceeding if independent legal representation is not available to such minor by reason of inability to pay other counsel or other circumstances," § 249.

Plaintiff Tomacita Negron, aged 16, was taken into custody on October 16, 1969, upon a petition brought by her mother claiming her to be a person in need of supervision. On the following day, the Family Court held a fact-finding hearing at which Tomacita was represented by a member of the New York Legal Aid Society who had been appointed as her law guardian. Upon her admission of the allegations of the petition, she was found to be a person in need of supervision and was remanded to Manida Hall Juvenile Center, first until October 27, when she was again represented by a law guardian in a dispositional hearing which was adjourned, and then until November 6.

Jonathan A. Weiss, then a staff attorney for MFY Legal Services, Inc., who brought this action as Tomacita Negron's "next friend," had represented her on two occasions earlier in 1969 when her mother filed petitions alleging her to be in need of supervision. Each time he had succeeded in getting Mrs. Negron to withdraw the petition. There was an intervening placement, in connection with which Mr. Weiss apparently did not represent her, at another juvenile centre whence, according to her mother, Tomacita exited through a back window. Nothing in the transcript of the October 17 Family Court hearing indicates that Tomacita manifested any desire to have Mr. Weiss rather than the Legal Aid Society lawyer act for her. Indeed, the only evidence that Tomacita desired Mr. Weiss' services is his statement in a supplemental affidavit, apparently submitted after the argument in the district court, that when he got to see her on November 6, as recounted below, she informed him "that she had been asking

for him as her lawyer," without any detail as to when or to whom the request was made.

Late in the afternoon of Friday, October 31, 1969, Mr. Weiss learned "through the family" that Tomacita was at Manida Hall. Wishing to see her over the weekend, he applied to various state or city employees to that purpose. While the affidavits differ as to the cooperativeness or uncooperativeness of the employees and of Mr. Weiss, it seems fairly plain he was told that he could see Tomacita only if accompanied by one of her parents or if authorized by one of the many judges of the Family Court, all of whom were listed in the telephone book, or by filing a notice of appearance when the Family Court opened early on the morning of Monday, November 3.

Mr. Weiss did not follow either course that might have made it possible to see Tomacita during the weekend—for what useful purpose the record does not disclose. He claimed in argument that application to Mrs. Negron would have been unavailing, but this hardly seems clear in light of the fact that she had consented to his representing Tomacita on two prior petitions that year and, indeed, had withdrawn both those petitions upon Mr. Weiss' urging. Moreover, it was "through the family" that he learned of Tomacita's presence in Manida Hall. He explained his failure to apply to one of the Family Court judges as reflecting a desire not to intrude on their weekend privacy. While such consideration is appreciated by judges, it would not be a sufficient reason for failing to act if Mr. Weiss had reason to consider that Tomacita was suffering any significant harm or that her case was being prejudiced in a manner which consultation with him over the weekend might have cured. It seems much more likely that his inaction was due to a sound realization that, since she had been lawfully detained as the result of a proceeding wherein she was represented by counsel to whose appearance she had assented, nothing could be done for her until the dispositional hearing on November 6, and that by filing a notice of appearance on Monday, November 3, he could see her long before that time. When Monday arrived, instead of following that simple course, he advised counsel for the New York City Office of Probation around 4 P.M. that he was on his way to federal court to file an action for a declaratory judgment and to request a preliminary injunction and a temporary restraining order. In fact, the order to show cause submitted to and signed by the district judge contained no provision for a temporary restraining order and requested a hearing on November 10. Before that date, Mr. Weiss filed a notice of appearance in the Family Court and appeared for Tomacita at the hearing on November 6, when she was remanded to the centre and the case was adjourned for a fortnight. The record does not inform us just what happened then, although it appears that the court determined Tomacita to require supervision and remanded her to the custody of the Hudson Training School. Mr. Weiss has appealed the disposition and initial fact-finding within the state system, where the matter is still pending.

Apparently realizing that any urgency had disappeared, the district judge did not render his decision until March 5, 1970. He found that the requirements with respect to attorneys' visits at juvenile centers were reasonable [2] and not

---

2. An affidavit by Arthur B. Cole, Director of Operations of the Institutional Services, under the jurisdiction of the Office of Probation for the courts of New York City, explained what the procedures were. He distinguished between "the usual case" and "the exceptional case." In the former, an attorney desiring to visit juvenile clients is advised to file a notice of appearance with the Family Court and to bring a copy with him. He is also asked to state the date and time when he wishes to visit, so that the youngster can be made available. The interview is conducted in complete privacy unless the attorney requests otherwise. The attorney is advised that the center prefers interviews between 9:00 A.M. and 5:00

unconstitutional, and accordingly he denied the request for a temporary injunction insofar as it sought relief from practices requiring, first, that an attorney produce a notice of appearance or permission of the Family Court or of the juvenile's parents when he wishes to visit with a juvenile; second, that he make an advance appointment; and third, that an inmate who desires to contact an attorney do so by mail rather than telephone. He also denied the request for damages. On the other hand, he enjoined defendants from denying plaintiff the right to consult privately with her attorney and from refusing to arrange appointments "in such a manner as to discriminate against plaintiff and her attorney." Both sides have appealed.

 To take the easiest point first, we wholly approve the denial of an injunction with respect to the practice concerning the making of appointments.[3] As explained in the affidavit referred to in fn. 2, such a practice is desirable "to insure the child's appearance for the interview instead of being, for example, at the clinic, at school, in court or at other activities," including, we suppose, such essential ones as eating, bathing and sleeping. There is not a word in the papers to suggest that the state authorities have been in any way arbitrary in scheduling interviews with counsel, or that they would insist on an advance appointment if a true emergency occurred, see fn. 3. In such circumstances, it is difficult to view the advance appointment practice as imposing a burden of any significance upon the right to rep-

resentation by counsel of one's choice. The requirements with respect to proof of authority to represent the juvenile are also reasonable in the "usual case," see fn. 2, and in all but the most exceptional "exceptional case." The state has a legitimate interest in protecting juveniles under detention from visits by attorneys (or persons asserting themselves to be such) whom the juveniles have expressed no desire to see and who have not established authority to speak for them. When we refer to the exceptional "exceptional case," we are thinking of one in which a juvenile might have a particularized need to consult an attorney outside the preferred visiting hours and at a time when parental or Family Court permission would be difficult to obtain in short order. But the affidavits are far from convincing us that the officials would be obdurate in such an instance, and Tomacita Negron's case surely did not present a situation of that sort. Similarly, we do not believe—and the facts of this case in no way alter our belief—that the juvenile's right to counsel is unduly curtailed by the 9:00 A.M. to 5:00 P.M. visiting hour restriction with its permissible exceptions by special arrangement for weekend and after-hour meetings.

 This leaves the matter of the juvenile's right to contact his attorney by telephone. The prayers for relief in the complaint and the amended complaint were silent on this point. So was the moving affidavit. The issue entered the case only on the basis of an assertion in the supplemental affidavit of Mr. Weiss

P.M. on weekdays when the Family Court is in session, but will arrange for interviews at earlier or later hours or on weekends if the attorney requests. The "exceptional case" is where the attorney has been unable to file a notice of appearance. Normally he may then see the child only if accompanied by the parents or one of them having custody of the child, or the child's legal guardian, who will attest the attorney's authority. The staff, however, is instructed to consult with a superior officer "regarding any other exceptional instances which may occur";

some such superior is "always able to be contacted at any time of the day or evening." The objective of these procedures is to ascertain that the person visiting has in fact been retained to represent the juvenile with reference to his detention.

3. We have avoided the word "requirement" since the record does not demonstrate that the practice with respect to making advance arrangements is an absolute. A letter dated November 10, 1969, to Mr. Weiss from one of defense counsel used the phrase "it is strongly advisable."

that he "was informed by his client Tomacita Negron that the Center was very restrictive of the use of the telephone and my client doubted that she could call me," and that a social worker at Manida Hall told him that the only person Probation would call was Tomacita's mother. While we tend to believe that a juvenile detained in a center is constitutionally entitled to access to a telephone, under reasonable regulations designed to prevent abuse, either to enlist the aid of an attorney or to communicate with one already retained, vague hearsay statements of the sort contained in the supplemental affidavit, on a point the defendants could reasonably have considered not to have been at issue, did not call for an injunction. The request for damages of $10,001, evidently inserted out of abundant but unnecessary caution in the event that the court declined to assume jurisdiction under 28 U.S.C. § 1343(3), was wholly unsubstantiated and the propriety of its denial has not been seriously challenged.

▮ Turning to the cross-appeal, we fully agree with the district court that a detained juvenile has a constitutional right to consult with an attorney in privacy and that the New York authorities could not properly discriminate against Mr. Weiss and Tomacita in arranging for consultations outside the normal 9:00 A.M. to 5:00 P.M. weekday hours. But there was no basis for thinking they had infringed either of these rights. The complaints and the affidavits made no claim of discrimination against Mr. Weiss or his client; rather the complaint, with the usual allegations designed to make this a class action, condemned the Manida Hall practices as they applied to juveniles generally. On the issue of privacy, Mr. Weiss' moving affidavit contained the double hearsay statement that his social worker, Betty Corliss, was informed by a Mrs. Thomas, a Manida Hall social worker, that he "could not see the girl except with the written permission of the family court and with a social worker present," and a claim that when he called Mrs. Thomas, she "confirmed her earlier statement." In contradiction to Mr. Weiss' allegation we have affidavits of Counsel to the Administrative Board of the Judicial Conference of the State of New York and of Mr. Cole, see fn. 2, both of whom assert in the most positive terms that interviews between the juvenile and the attorney are completely private, unless the attorney specifically permits a staff member to be present. Counsel to the Office of Probation for the New York City Courts stated in another affidavit that she had spoken to Miss Thomas who denied having told Mr. Weiss he could see his client only in the presence of a social worker. Confronted with all this, Mr. Weiss took another tack. In his supplemental affidavit he conceded he had seen Tomacita alone, but alleged that "the door was left open, so I had to close it myself only to discover that this room, right next to the social worker's room, had paper-thin walls so that to preserve privacy you have to almost whisper." The defendants, reasonably we think, did not continue this volley.

▮ The district judge did not decide there had been a discrimination against Mr. Weiss. Neither did he measure the wall or determine its soundproof characteristics. Rather he justified the injunction, permanent as we read it, on the ground that defendants conceded plaintiff's rights in these two respects and there was consequently no objection to ordering them to refrain from what they would not do anyway. But "it is elementary that a court of equity will not enjoin one from doing what he is not attempting and does not intend to do." New Standard Publishing Co. v. F.T.C., 194 F.2d 181, 183 (4 Cir. 1952).

Affirmed on appeal, reversed on cross-appeal.